IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

------------------------------------------------------------x
AXIS SURPLUS INSURANCE
COMPANY,
: Civil Action No.
                    Plaintiff,
          -against-                         04 CV 10432 RGS
RAYTHEON COMPANY,
                    Defendant.
------------------------------------------------------------x

**COMPLAINT**

Plaintiff AXIS Surplus Insurance Company ("AXIS") asserts this Complaint against Defendant Raytheon Company ("Raytheon") and states as follows:

### PARTIES

1.  AXIS is an insurance company organized and existing under the laws of Illinois with its principal office in Chicago, Illinois.

2.  Raytheon is a corporation organized and existing under the laws of Delaware with its principal office in Lexington, Massachusetts.

### VENUE AND JURISDICTION

3.  This Court has jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C. §1332(a)(3). AXIS and Raytheon are of diverse citizenship, and the amount in controversy exceeds $75,000.

4.  This Court has personal jurisdiction over Raytheon pursuant to Rule 4(k)(1)(A), Federal Rules of Civil Procedure, and M.G.L.A. 223A § 2.

5.      Venue lies in this judicial district pursuant to 28 U.S.C. §1391. Raytheon resides in this district and a substantial part of the events or omissions giving rise to the claim asserted herein occurred in this district.

## FACTS

*The Policies*

6.      The Federal Insurance Company ("Federal") issued Executive Protection Policy No. 8151-5319 to Raytheon for the September 15, 2002 to September 15, 2003 Policy Period (the "Primary Policy"). A true and correct copy of the Primary Policy is attached hereto as Exhibit A.

7.      AXIS issued SecurExcess Policy No. EBN599676 to Raytheon for the February 20, 2003 to September 15, 2003 Policy Period (the "Excess Policy"). A true and correct copy of the Excess Policy is attached hereto as Exhibit B.

8.      Except as specifically set forth in the provisions of the Excess Policy, the insurance afforded under the Excess Policy applies in conformance with the provisions of the Primary Policy. The Excess Policy states, in relevant part:

> [i]n reliance on all statements made in the application(s) for this Policy and the Underlying Insurance and all information provided to the Insurer and any or all of the Underlying Insurers, and subject to the provisions of this Policy, the Insurer and the Policyholder...agree [that] the Insurer shall provide the Insureds with insurance during the Policy Period excess of all applicable Underlying Insurance. Except as specifically set forth in the provisions of this Policy, the insurance afforded hereunder shall apply in conformance with the provisions of the applicable Primary Policy and, to the extent coverage is further limited or restricted thereby, to any other applicable Underlying Insurance. In no event shall this Policy grant broader coverage than would be provided under the most restrictive policy constituting part of the applicable Underlying Insurance.

9.      Subject to all of its terms, conditions, limitations and exclusions, the Primary Policy's Fiduciary Liability Coverage Section (the "Fiduciary Section") applies to "Loss for which the Insured becomes legally obligated to pay on account of any Claim first made against the Insured

during the Policy Period ... for a Wrongful Act committed, attempted, or allegedly committed or attempted before or during the Policy Period." Fiduciary Section cl. 1.

10. The Primary Policy defines Insureds to include Raytheon, as the Sponsor Organization, and "natural persons serving as a past, present or future trustee, director, officer or employee of [Raytheon] ..." Fiduciary Section cl. 15.

11. The Primary Policy provides in Clause 5(g) that:

> Federal shall not be liable for Loss on account of "any Claim made against any Insured...based upon, arising from, or in consequence of any demand, suit or other proceeding pending or order, decree or judgment entered against any Insured, on or prior to the Pending or Prior date set forth in Item 7 of the Declarations for this coverage section, or the same or any substantially similar fact, circumstance or situation underlying or alleged therein." (the "Federal Pending or Prior Exclusion").

Fiduciary Section cl. 5(g). The date set forth in Item 7 of the Fiduciary Section Declarations is September 15, 2000.

12. The Excess Policy furthermore provides in Endorsement No. 4 that:

> the Insurer shall not be liable for any amount in any Claim taking place during the Policy Period and arising under any Insurance Product, which is based upon, arising from, or attributable to:
>
> (a) any demand, suit or other proceeding pending...against any Insured on or prior to September 15, 2000 or any wrongful act, fact, circumstance or situation underlying or alleged therein; or
>
> (b) any other wrongful act, fact, circumstance or situation whenever occurring, which together with a wrongful act, fact, circumstance or situation described in (a) above are causally or logically interrelated by a common nexus.

(the "Axis Pending or Prior Exclusion").

*The Prior Litigation*

13. On October 19, 1999 -- nearly one year before the September 15, 2000 Pending or Prior date set forth in the Federal and Axis Pending or Prior Exclusions -- a putative securities class action styled Meisel, et al. v. Raytheon, *et al.*, Civil Action No. 99 CV 12142 PBS (the "Prior Litigation"), was filed in this Court against Raytheon, former Raytheon Chief Executive Officer Daniel Burnham ("Burnham") and former Raytheon Chief Financial Officer Franklyn Caine ("Caine").

14. The plaintiffs in the Prior Litigation filed a Consolidated and Amended Class Action Complaint on June 12, 2000 (the "Amended Complaint"), three months before the Prior or Pending date set forth in the Federal and Axis Pending and Prior Claims Exclusions. A true and correct copy of the Amended Complaint is attached hereto as Exhibit C. The defendants named in the Amended Complaint included Raytheon, Burnham, Caine and other current or former directors and officers of Raytheon.

15. The Amended Complaint bases the causes of action asserted therein on allegations regarding ongoing misrepresentations in Raytheon's public statements; financial problems and accounting improprieties affecting Raytheon's Engineers & Constructors Division ("RE&C"); cost overruns, project delays and a shortage of engineers affecting Raytheon's fixed-price Department of Defense contracts; and the decline in Raytheon's stock price following adverse public disclosures in October 1999. Such allegations include without limitation the following:

> (a) that "through the [October 7, 1998 to October 12, 1999] Class Period, defendants issued materially false and misleading statements which deceived the investing public as to the Company's financial performance and position, by means of, inter alia, accounting irregularities and violations of Generally Accepted Accounting Principles ("GAAP") in [RE&C]," Am. Comp. ¶2;
>
> (b) that Raytheon caused RE&C to violate GAAP by, inter alia, failing to "record [ ] ... losses on approximately 40 major contracts in process, even though

-4-

      RE&C management had already quantified that such losses were expected to result from these projects[,]" id. ¶¶ 39-55; by improperly "recogniz[ing] ...revenues...on anticipated contracts" which "never closed[,]" id. ¶¶ 56-65; and by "prematurely book[ing] costs [and] ... corresponding revenues and profits" before such costs were incurred, id. ¶¶ 66-70;

(c)     that the problems affecting RE&C led to the sale of that division in April 2000, id. ¶¶ 157, 159;

(d)     that "throughout the Class Period, Raytheon knew but failed to disclose that a number of the Company's key government defense projects were materially behind schedule and over-budget[.]" id. ¶¶ 2, 71-98;

(e)     that "throughout the Class Period, Raytheon knew but failed to disclose ... that the Company was suffering from a critical shortage of skilled engineers required to satisfy its government contracts." id. ¶ 2, 99-102;

(f)     that the Raytheon Aircraft Corporation was "materially over-budget and behind schedule" on four major development contracts with the U.S. Air Force and Navy, id. ¶¶ 103-107;

(g)     that "statements regarding [Raytheon's] and RE&C's 1999 second quarter results and [Raytheon's August 18, 1999 Form 10-Q (the "August 1999 10-Q")](including the financial statements contained therein) were materially false and misleading in that [Raytheon] and RE&C failed to disclose millions of dollars of losses and write-downs required under GAAP and prematurely recognized million of dollars of profits on accelerated costs and revenues," id. ¶¶ 134-141;

(h)     that, on October 12, 1999, the *Wall Street Journal* reported that Raytheon "was over cost or behind schedule on more than a dozen of its Pentagon fixed-price contracts," id. ¶143, and Raytheon announced that it "would be taking total charges of $638 million pre-tax to be recorded in 1999" for "operating charges" due to "contract performance issues," "restructuring charges" and asset write-downs, and that it had reduced its earnings expectations for 1999 and 2000 as a result of revenue shortfalls and lower-than-expected margins, id. ¶ 145; and

(i)     that after "the true, adverse information was finally disclosed by the Company at the end of the Class Period, the price of Raytheon common stock .. declined by approximately 70% from its Class Period high in July 1999, ... and has remained depressed," id. ¶¶ 2, 147.

*The ERISA Litigation*

16. On or about May 19, 2003, a putative class active styled Wall v. Raytheon Company, et al. Civil Action No. 03-10940 RGS (the "ERISA Litigation"), was filed in this Court. The Complaint in the ERISA Litigation (the "ERISA Complaint") purports to assert claims against Raytheon and current and former directors and officers of Raytheon pursuant to Section 502 of the Employment Retirement Income Security Act, 29 U.S.C. 1129. A true and correct copy of the ERISA Complaint is attached hereto as Exhibit D.

17. Raytheon has requested coverage under the Primary Policy and the Excess Policy with respect to the ERISA Litigation.

18. Like the Amended Complaint in the Prior Litigation, the ERISA Complaint bases the causes of action asserted therein on allegations regarding ongoing misrepresentations in Raytheon's public statements; financial problems and accounting improprieties affecting RE&C; cost overruns, project delays and a shortage of engineers affecting Raytheon's fixed-price Department of Defense contracts; and the decline in Raytheon's stock price following adverse public disclosures in October 1999. Such allegations include without limitation the following:

 (a) that "Raytheon, since at least mid-1999 and likely much earlier has engaged in regular and recurring misrepresentation concerning the financial health of several of its major products divisions, resulting in Plan participants receiving an artificially inflated picture of how attractive an investment Company stock was for their retirement savings." ERISA Compl. ¶ 58;

 (b) that "Raytheon had been severely underestimating the effects that cost overruns in their fixed contracts with the Department of Defense would have on the Company's financials, and, on the whole, misrepresenting the ongoing financial profitability of the Company," and that "[a]pproximately a dozen of [Raytheon's] fixed-price Department of Defense contracts were over budge and behind schedule." id. ¶ 61;

 (c) that Raytheon manipulated the accounting for RE&C by, inter alia, "defer[ring] or avoid[ing] recognition of cost increases" on major projects, even though the company's management already had quantified and

documented those increases, and by "inflating projected revenues by making unreasonable assumptions about revenue recovery." id. ¶¶ 66-72, 81;

(d) that the accounting improprieties, misrepresentations and other problems concerning RE&C led to the sale of that division in April 2000 and exposed Raytheon to liability to the purchaser of RE&C. id. ¶¶ 67, 74-75;

(e) that "Raytheon had been plagued for some time by a shortage of quality software engineers to work on revenue-producing programs, and faced the likelihood of not being able to complete 1999 orders." id. ¶ 61;

(f) that the Raytheon Aircraft division "has had ongoing financial and operational control problems, and caused [Raytheon] to take significant charges against earnings during the Class Period because of this long-term mismanagement." id. ¶ 97;

(g) that Raytheon's August 1999 10-Q and related statements were "inaccurate, incomplete and misleading" because they reflected "grossly inadequate" accounting charges, failed to disclose that "additional charges would be forthcoming" and failed to disclose the other adverse information described above. id. ¶¶ 61;

(h) that the problems affecting Raytheon's fixed price Department of Defense contracts and related accounting issues were "initially hinted at in an October 12, 1999 *Wall Street Journal* article, and gradually admitted to by Company executed and spokespersons over the next few days." id. ¶¶ 59-61;

(i) that, on October 12, 1999, Raytheon "announced ... that its previously predicted 'cost reduction action' charge of $350-$450 million was low, and that the actual charge would be upwards of $630 million" and "reduced its earnings expectations for 1999 and 2000." id. ¶ 62;

(j) that "[o]n October 12, 1999, after the *Wall Street Journal* article's publication, Raytheon's stock price plummeted; the New York Stock Exchange had to halt trading in [Raytheon] shares. The Company's admissions regarding the true state of its businesses triggered the largest percentage drop in its stock price in two decades, with its Class A shares falling 46% from $42 to $22.50 per share, and its Class B equity dropping 45% to close at $24.25. Raytheon stock has never truly recovered from this devastating day of trading." id. ¶ 65.

*Denial of Coverage*

19. The Prior Litigation is a "demand, suit or other proceeding pending ... against any Insured on or prior to September 15, 2000 ..." within the meaning of the Federal and Axis Pending or Prior Exclusions.

20. The ERISA Litigation is based upon, arising from, or attributable to the Prior Litigation or the same or any substantially similar fact, circumstance or situation underlying or alleged in the Prior Litigation within the meaning of the Federal Pending or Prior Exclusion, including the allegations referenced in Paragraph 15 above. As a result, the Federal Pending or Prior Exclusion excludes the ERISA Litigation from coverage under the Primary Policy.

21. Likewise, the ERISA Litigation is based upon, arising from or is attributable to the Prior Litigation or any wrongful act, fact, circumstance or situation underlying or alleged therein within the meaning of paragraph (a) of the Axis Pending or Prior Exclusion. As a result, coverage for the ERISA Litigation is also excluded pursuant to paragraph (a) of the Axis Pending or Prior Exclusion.

22. At the very least, the ERISA Litigation is based upon, arising from or is attributable to any other wrongful act, fact, circumstance or situation which is causally or logically interrelated by a common nexus to a wrongful act, fact, circumstance or situation underlying or alleged in the Prior Litigation within the meaning of paragraph (b) of the Axis Pending or Prior Exclusion. As a result, coverage for the ERISA Litigation is also excluded pursuant to paragraph (b) of the Axis Pending or Prior Exclusion.

23. Indeed, the ERISA Plaintiffs themselves allege that even the subsequent wrongful acts committed by Raytheon as detailed in the ERISA Complaint are causally related to the acts and

omissions that form the basis of the Prior Litigation. Specifically, the Plaintiffs assert this relationship in the ERISA Litigation by alleging that:

(a) Raytheon had to sell RE&C to Washington Group International, Inc. ("WGI") to avoid further losses, and that Raytheon's executives and management knew that a potential purchaser had to be persuaded that the losses were anomalies and that RE&C had value going forward. Therefore, Raytheon's managers discouraged and delayed accurate reporting of adverse financial information. ERISA Compl. ¶¶ 67-68, 72;

(b) the action by WGI against Raytheon and "the events related to that action", including, among other things, Raytheon's failure to recognize cost increases on projects and inflating projected revenues, exposed Raytheon to billions of dollars in damages. ERISA Compl. ¶¶ 81-82;

(c) the dispute with WGI caused further losses to Raytheon and led to additional negative reporting about the financial stability of Raytheon, causing the company and its stock to be further devalued throughout 2001 and to the present. ERISA Compl. ¶¶ 82-94.

(d) the SEC began investigation Raytheon's Aircraft division in 2003 after Raytheon took significant charges against earnings "because of [Raytheon's] long-term mismanagement." ERISA Compl. ¶ 97; and

(e) like the Defendants in the Prior Litigation, the ERISA Defendants "provided misleading, inaccurate, and incomplete information to them regarding the true

health and profitability of the Company, and therefore, its soundness as an investment vehicle." ERISA Compl. ¶ 134.

24. On September 19, 2003 Federal sent a letter to Raytheon denying coverage for the ERISA Litigation for the reasons set forth herein. The September 19, 2003 letter also notified Raytheon that Federal had filed an action in this court (03 Civ. 11800 RGS) seeking a declaratory judgment that Federal had no liability under the Primary Policy with respect to the ERISA Litigation.

25. The Excess Policy applies in conformance with the provisions of the Primary Policy, except to the extent coverage is further limited or restricted by the provisions of the Excess Policy. On March 2, 2004, AXIS sent a letter to Raytheon expressly adopting and incorporating Federal's September 19, 2003 coverage position denying coverage for the ERISA Litigation pursuant to the Federal Pending or Prior Exclusion, as well as supplementing AXIS' own coverage position to exclude coverage for the ERISA Litigation based upon the AXIS Pending and Prior Exclusion set forth in Endorsement No. 4 of the Excess Policy.

## COUNT I
### (Declaratory Judgment - Non-Coverage)

26. All of the foregoing allegations are realleged and incorporated by reference herein.

27. The Federal and Axis Pending or Prior Exclusions bar coverage under the Primary and Excess Policy with respect to the ERISA Litigation and, as a result, AXIS has no liability under the Excess Policy with respect to that litigation.

28. An actual and justiciable controversy exists between AXIS and Raytheon as to whether AXIS has any liability under the Excess Policy with respect to the ERISA Litigation and, in particular, whether the Federal and Axis Pending or Prior Exclusions bar coverage under the Excess Policy with respect to that litigation. Declaratory relief is necessary and appropriate to avoid the risks and uncertainty arising from such controversy.

29. Any and all conditions precedent to AXIS's claim for declaratory relief have been satisfied.

WHEREFORE, AXIS prays that the Court enter judgment pursuant to 28 U.S.C. § 2201(a) declaring that AXIS has no liability under the Excess Policy with respect to the ERISA Litigation and that AXIS is entitled to recover from Raytheon any and all amounts paid by AXIS to or on behalf of Raytheon with respect to the ERISA Litigation, and grant AXIS such other and further relief as the Court may deem appropriate.

                    AXIS SURPLUS INSURANCE
                    COMPANY
                    By its counsel,

                    /s/ John D. Hughes

                    John D. Hughes, Esq. (BBO No. 243660)
                    Windy L. Rosebush, Esq. (BBO No. 636962)
                    Edwards & Angell, LLP
                    101 Federal Street
                    Boston, MA 02110
                    Ph: (617) 439-4444
                    Fx: (617) 439-4170

Date: March 3, 2004