UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2004 JUN -1  P 4: 59

U.S. DISTRICT COURT
DISTRICT OF MASS.

|  |  |
|---|---|
| FEDERAL INSURANCE COMPANY,<br>AXIS SURPLUS INSURANCE COMPANY,<br><br>Plaintiffs,<br><br>v.<br><br>RAYTHEON COMPANY,<br><br>Defendant, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No.
04-CV-10432RGS

## PLAINTIFF AXIS SURPLUS INSURANCE COMPANY'S MEMORANDUM
## IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE PLEADINGS

Plaintiff AXIS Surplus Insurance Company ("AXIS") hereby joins in Federal Insurance Company's ("Federal") Motion for Judgment on the Pleadings and incorporates Federal's Memorandum of Law herein.  In addition, in support of its Motion for Judgment on the Pleadings (the "Motion"), Axis files this supplemental Memorandum of Law.  This Memorandum specifically addresses the policy language and Prior and Pending Claims Exclusion contained in the Axis excess policy.  For the reasons set forth herein and in Federal's Memorandum of Law, Axis is entitled to judgment in its favor on the pleadings pursuant to Fed. R. Civ. P. 12(c).

## FACTUAL BACKGROUND

### A.    The Policy

Federal Insurance Company ("Federal") issued Executive Protection Policy No. 8151-5319 to Raytheon for the September 15, 2002 to September 15, 2003 Policy Period (the "Primary

Policy").[1]  AXIS issued SecurExcess Policy No. EBN599676 to Raytheon for a February 20, 2003 to September 15, 2003 Policy Period (the "Excess Policy").[2]  The Excess Policy applies in conformance with the provisions of the Primary Policy, except to the extent coverage is further limited or restricted by the provisions of the Excess Policy.

Subject to all of the Primary Policy's terms, conditions, limitations and exclusions, its Fiduciary Liability Coverage Section (the "Fiduciary Section") applies to "Loss for which the Insured becomes legally obligated to pay on account of any Claim first made against the Insured during the Policy Period ... for a Wrongful Act committed, attempted, or allegedly committed or attempted before or during the Policy Period." Fiduciary Section cl. 1.  The Primary Policy defines Insureds to include Raytheon, as the Sponsor Organization, and "natural persons serving as a past, present or future trustee, director, officer or employee of [Raytheon] ..." Fiduciary Section cl. 15.

The Primary Policy provides in Clause 5(g) that Federal shall not be liable for Loss on account of "any Claim made against any Insured based upon, arising from, or in consequence of any demand, suit or other proceeding pending, or order, decree or judgment entered against any Insured on or prior to [September 15, 2000], or the same or any substantially similar fact, circumstance or situation underlying or alleged therein." (the "Federal Pending and Prior Claims Exclusion").

In addition to the Federal Pending and Prior Claims Exclusion, the Excess Policy contains its own Pending and Prior Claims Exclusion in Endorsement No. 4:

---

[1] A true and correct copy of the Primary Policy is attached to the Complaint as Exhibit A.  The Primary Policy's Declarations state that its Fiduciary Liability Coverage Section is written on A "Claims Made" basis.  "A Claims-Made policy covers the insured for claims made during the policy year and reported within that period or a specified period thereafter regardless of when the covered act or omission occurred." Charles T. Main, Inc. v. Fireman's Fund Insurance Company, 406 Mass. 862, 863-864 (1990).

[2] A true and correct copy of the Excess Policy is attached to the Complaint as Exhibit B.  The Declarations of the Excess Policy likewise state that: "This Policy may only apply to claims first made against the Insureds during the Policy Period . . . ."

BOS_446493_5/WROSEBUSH

the Insurer shall not be liable for any amount in any Claim taking place during the Policy Period and arising under any Insurance product, which is based upon, arising from, or attributable to:

(a) any demand, suit or other proceeding pending, or order, decree or judgment entered, against any Insured on or prior to September 15, 2000 or any wrongful act, fact, circumstance or situation underlying or alleged therein; or

(b) any other wrongful act, fact, circumstance or situation whenever occurring, which together with a wrongful act, fact, circumstance or situation described in (a) above are causally or logically interrelated by a common nexus.

(the "Axis Pending and Prior Claims Exclusion").

## B.    The Prior Litigation

On October 18, 1999 -- nearly one year before the September 15, 2000 Pending or Prior date set forth in the Federal and Axis Pending and Prior Claims Exclusions -- a putative securities class action styled Meisel, et al. v. Raytheon, *et al.*, Civil Action No. 99 CV 12142 PBS (the "Prior Litigation"), was filed in this Court against Raytheon, former Raytheon Chief Executive Officer Daniel Burnham ("Burnham") and former Raytheon Chief Financial Officer Franklyn Caine ("Caine").

The plaintiffs in the Prior Litigation filed a Consolidated and Amended Class Action Complaint on June 12, 2000 (the "Amended Complaint"), three months before the Prior or Pending date set forth in the Federal and Axis Pending and Prior Claims Exclusions.[3]  The defendants named in the Amended Complaint included Raytheon, Burnham, Caine and other current and former directors and officers of Raytheon.

The Amended Complaint bases the causes of action asserted therein on allegations regarding: ongoing misrepresentations in Raytheon's public statements; financial problems and accounting improprieties affecting Raytheon's Engineers & Constructors Division ("RE&C");

---

[3] A true and correct copy of the Amended Complaint is attached to the Complaint as Exhibit C.

BOS_446493_5/WROSEBUSH

cost overruns, project delays and a shortage of engineers affecting Raytheon's fixed-price Department of Defense contracts; and the decline in Raytheon's stock price following adverse public disclosures in October 1999. Such allegations include the following:

(c)     that "through the [October 7, 1998, and October 12, 1999] Class Period, defendants issued materially false and misleading statements which deceived the investing public as to the Company's financial performance and position, by means of, <u>inter alia</u>, accounting irregularities and violations of Generally Accepted Accounting Principles ("GAAP") in [RE&C]," Am. Comp. ¶2;

(d)     that Raytheon caused RE&C to violate GAAP by, <u>inter alia</u>, failing to "record [ ] ... losses on approximately 40 major contracts in process, even though RE&C management had already quantified that such losses were expected to result from these projects," <u>Id</u>. ¶¶ 58-65; and by "prematurely book[ing] costs [and] ... corresponding revenues and profits" before such costs were incurred, <u>Id</u>. ¶¶ 66-70;

(e)     that the problems affecting RE&C led to the sale of that division in April 2000, <u>Id</u>. ¶¶ 157, 159;

(f)     that "throughout the Class Period, Raytheon knew but failed to disclose that a number of the Company's key government defense projects were materially behind schedule and over-budget[.]" <u>Id</u>. ¶¶ 2, 71-98;

(g)     that "throughout the Class Period, Raytheon knew but failed to disclose ... that the Company was suffering from a critical shortage of skilled engineers required to satisfy its government contracts." <u>Id</u>. ¶ 2, 99-102;

(h)     that the Raytheon Aircraft Corporation was "materially over-budget and behind schedule" on four major development contracts with the U.S. Air Force and Navy, <u>Id</u>. ¶¶ 103-107;

(i)     that Raytheon's August 18, 1999 Form 10-Q (the "August 1999 10-Q) and other "statements regarding [Raytheon's] and RE&C's 1999 second quarter results (including the financial statements contained therein) were materially false and misleading in that [Raytheon] and RE&C failed to disclose millions of dollars of losses and write-downs required under GAAP and prematurely recognized million of dollars of profits on accelerated costs and revenues," <u>Id</u>. ¶¶ 134-141;

(j)     that, on October 12, 1999, the *Wall Street Journal* reported that Raytheon "was over cost or behind schedule on more than a dozen of its Pentagon

- 4 -

fixed-price contracts," Id. ¶143, and Raytheon announced that it would be taking total charges of $638 million pre-tax to be recorded in 1999 for operating charges due to contract performance issues, restructuring charges and asset write-downs, and that it had reduced its earnings expectations for 1999 and 2000 as a result of revenue shortfalls and lower-than-expected margins, Id. ¶¶ 145; and

(k)    that after "the true, adverse information was finally disclosed by the Company at the end of the Class Period, the price of Raytheon common stock .. declined by approximately 70% from its Class Period high in July 1999, ... and has remained depressed," Id.

## C.    The ERISA Litigation

On or about May 19, 2003, a putative class action styled Wall v. Raytheon Company, et al., Civil Action No. 03-10940 RGS (the "ERISA Litigation"), was filed in this Court. A Second Consolidated Amended Complaint in the ERISA litigation was filed with the Court on or about April 22, 2004 (the "ERISA Complaint"). The ERISA Complaint purports to assert claims against Raytheon and current and former directors and officers of Raytheon pursuant to Section 502 of the Employment Retirement Income Security Act, 29 U.S.C. 1132. A true and correct copy of the ERISA Complaint is attached hereto as Exhibit A.

Raytheon has requested coverage under the Primary and Excess Policy with respect to the ERISA Litigation. Just like the Amended Complaint in the Prior Litigation, the ERISA Complaint bases the causes of action asserted therein on allegations regarding: ongoing misrepresentations in Raytheon's public statements; financial problems and accounting improprieties affecting RE&C; cost overruns, project delays and a shortage of engineers affecting Raytheon's fixed-price Department of Defense contracts; and the decline in Raytheon's stock price following adverse public disclosures in October 1999.

These allegations include the following:

(a)    that "Raytheon, since at least late-1998 and likely much earlier, has engaged in regular and recurring misrepresentation concerning the financial health of several of its major products divisions, resulting in Plan

BOS_446493_5/WROSEBUSH

participants receiving an artificially inflated picture of how attractive an investment Company stock was for their retirement savings." ERISA Compl. ¶ 65;

(b)    that "Raytheon had been severely underestimating the effects that cost overruns in their fixed contracts with the Department of Defense would have on the Company's financials, and, on the whole, misrepresenting the ongoing financial profitability of the Company," and that "[a]pproximately a dozen of [Raytheon's] fixed-price Department of Defense contracts were over budget and behind schedule." Id. ¶ 68;

(c)    that Raytheon manipulated the accounting for RE&C by, inter alia, "defer[ring] or avoid[ing] recognition of cost increases" on major projects, even though the company's management already had quantified and documented those increases, and by "inflating projected revenues by making unreasonable assumptions about revenue recovery," id. ¶¶ 108-114, 123;

(d)    that the accounting improprieties, misrepresentations and other problems concerning RE&C led to the sale of that division in April 2000 and exposed Raytheon to liability to the purchaser of RE&C, id. ¶¶ 108-110, 116-120;

(e)    that "Raytheon had been plagued for some time by a shortage of quality software engineers to work on revenue-producing programs, and faced the likelihood of not being able to complete 1999 orders," id. ¶ 68;

(f)    that the Raytheon Aircraft division is under active investigation by the SEC for its accounting practices, id. ¶ 105-107;

(g)    that Raytheon's 10-Q for the second fiscal quarter of 1999 and related statements were "inaccurate, incomplete and misleading" because they reflected "grossly inadequate" accounting charges, failed to disclose that "additional charges would be forthcoming" and failed to disclose other adverse information, id. ¶¶ 66, 68;

(h)    that the problems affecting Raytheon's fixed price Department of Defense contracts and related accounting issues were "initially hinted at in an October 12, 1999 *Wall Street Journal* article, and gradually admitted to by Company executives and spokespersons over the next few days," id. ¶¶ 68;

(i)    that, on October 12, 1999, Raytheon "announced ... that its previously predicted 'cost reduction action' charge of $350-$450 million was low, and that the actual charge would be upwards of $630 million" and "reduced its earnings expectations for 1999 and 2000 [,]" id. ¶ 69;

(j)    that "[o]n October 12, 1999, after the *Wall Street Journal* article's publication, Raytheon's stock price plummeted; the New York Stock Exchange had to halt trading in [Raytheon] shares. The Company's admissions regarding the true state of its businesses triggered the largest percentage drop in its stock price in two decades, with its Class A shares falling 46% from $42 to $22.50 per share, and its Class B equity dropping 45% to close at $24.25. Raytheon stock has never truly recovered from this devastating day of trading." Id. ¶ 72.

Thus, the complaints in the Prior Litigation and the ERISA Litigation both accuse the Raytheon defendants of engaging during 1998 and 1999 in a scheme to misrepresent the financial health of several of Raytheon's major products divisions in order to artificially and improperly inflate the value of Raytheon's stock. The complaint in the ERISA Litigation additionally alleges wrongful acts subsequent to 1999, but maintains that these subsequent wrongful acts were causally related to the wrongful acts that form the basis of the Prior Litigation. Specifically, the complaint in the ERISA Litigation asserts this relationship by alleging that:

(a)    Raytheon had to sell RE&C to Washington Group International, Inc. ("WGI") to avoid further losses, and that Raytheon's executives and management knew that a potential purchaser had to be persuaded that the losses were anomalies and that RE&C had value going forward. Therefore, Raytheon's managers discouraged and delayed accurate reporting of adverse financial information. ERISA Compl. ¶¶ 109-114

(b)    the action by WGI against Raytheon and "the events related thereto", including, among other things, Raytheon's failure to recognize cost increases on projects and inflating projected revenues, exposed Raytheon to close to a billion dollars in damages. ERISA Compl. ¶¶ 123-124;

(c)    the dispute with WGI caused further losses to Raytheon and led to additional negative reporting about the financial stability of Raytheon, causing the company and its stock to be further devalued throughout 2001 and to the present. ERISA Compl. ¶¶ 124-130;

(d)    the SEC began investigating Raytheon's Aircraft division's restatement of earnings in 1997, 1998 and 1999, which was "another example of the

Company's pattern of improperly recognizing revenue and losses with regards [sic] to ongoing contracts." ERISA Compl. ¶ 106-107; and

(e)    the ERISA Defendants "during the class period" communicated "inflated reports and prognostications about Raytheon's financial health and ongoing profitability" and issued "SEC filings and related Company statements and releases" which were "misleading, incomplete and inaccurate," leading the Plaintiffs to believe that "Raytheon Stock was a good investment." ERISA Compl.¶ 149-150.

## D.    Denial of Coverage

The Prior Litigation was a "demand, suit or other proceeding pending ... against any Insured on or prior to September 15, 2000 ..." within the meaning of the Federal and Axis Pending or Prior Exclusions. The ERISA Litigation was based upon, arising from, or attributable to the Prior Litigation or the same or any substantially similar fact, circumstance or situation underlying or alleged in the Prior Litigation within the meaning of the Federal Pending or Prior Claims Exclusion. As a result, the Federal Pending or Prior Claims Exclusion excluded the ERISA Litigation from coverage under the Primary Policy.

Likewise, the ERISA Litigation was based upon, arising from or was attributable to the Prior Litigation or any wrongful act, fact, circumstance or situation underlying or alleged therein within the meaning of paragraph (a) of the Axis Pending or Prior Claims Exclusion. As a result, coverage for the ERISA Litigation was similarly excluded pursuant to paragraph (a) of the Axis Pending or Prior Claims Exclusion. Furthermore, the ERISA Litigation was based upon, arising from or was attributable to any other wrongful act, fact, circumstance or situation which is causally or logically interrelated by a common nexus to a wrongful act, fact, circumstance or situation underlying or alleged in the Prior Litigation within the meaning of paragraph (b) of the Axis Pending or Prior Claims Exclusion. As a result, coverage for the ERISA Litigation was also excluded pursuant to paragraph (b) of the Axis Pending or Prior Claims Exclusion.

On September 19, 2003, Federal sent a letter to Raytheon denying coverage for the ERISA Litigation for the reasons set forth herein. The September 19, 2003 letter also notified Raytheon that Federal had filed an action in this Court (03 Civ. 11800 RGS) seeking a declaratory judgment that Federal had no liability under the Primary Policy with respect to the ERISA Litigation. On March 2, 2004, AXIS sent a letter to Raytheon expressly adopting and incorporating Federal's September 19, 2003 coverage position denying coverage for the ERISA Litigation pursuant to the Federal Pending or Prior Claims Exclusion. This letter also based AXIS' coverage position upon the AXIS Pending or Prior Claims Exclusion set forth in Endorsement No. 4 of the Excess Policy.

## ARGUMENT

Axis incorporates by reference the applicable standard of review for Motions for Judgment on the Pleadings, as well as the case law cited by Federal for the interpretation of insurance policies and exclusions contained therein which were cited in Federal's Motion for Judgment on the Pleadings. In addition, Axis includes the following case law and legal argument in support of its motion.

### A.    Because the Prior Litigation and the ERISA Litigation share a common factual nexus, the ERISA Litigation is excluded from coverage under the Federal and Axis Prior and Pending Claims Exclusions.

### 1.    Zunenshine v. Executive Risk Indemnity, Inc.

The decision by Judge Mukasey of the United States District Court for the Southern District of New York in Zunenshine v. Executive Risk Indemnity, Inc., No. 97 Civ. 5525 (MBM), 1998 WL 483475 (S.D.N.Y. Aug. 17, 1998) affirmed No. 98-9251, 182 F.3d 902, 1999 W.L. 464988 (2d Cir. June 29, 1999) (copy attached as Exhibit B) directs the proper result here. In Zunenshine, the defendant Executive Risk Indemnity, Inc. ("ERI") issued a

BOS_446493_5/WROSEBUSH

directors and officers liability policy to SLM International, Inc. ("SLM") in May, 1996. Id.

at *1. Like the Federal and Axis policies, the ERI policy was "claims-made" and provided

SLM's directors and officers with insurance coverage for losses arising from claims made against

them during the policy period, which was from May 24, 1996 through May 24, 1997.

Also like the Federal and Axis policies, the ERI policy contained a prior and pending

claim exclusion, as follows:

> The Underwriter will not pay Loss, including Defense
> Expenses, for Claims based upon, arising out of,
> directly or indirectly resulting from, in consequence of,
> or in any way involving:
>
> (1)    any fact, circumstance, situation, transaction,
> event, or Wrongful Act underlying or alleged in any
> prior and/or pending litigation or administrative or
> regulatory proceeding as of May 24, 1996[.]

Id.

On May 8, 1997, the plaintiffs in Zunenshine notified ERI that they had been sued by

investors who had purchased unsecured notes from SLM in March, 1994 (the "Noteholders'

Lawsuit"). The Noteholders' Lawsuit alleged that the defendants had negligently misrepresented

SLM's financial condition before the notes were issued. Id. at page 4. More particularly, the

plaintiffs in the Noteholders' Lawsuit claimed that the defendants had distributed a memorandum

concerning the sale of the notes which had falsely stated that:

(1)    SLM's net income for the first three-quarters of 1993 had increased by 54.3%;

(2)    SLM spent only 3% to 5% of its sales on television advertising; and

(3)    Neither a preliminary injunction issued against SLM, nor the underlying
trademark infringement action filed by one of its competitors, had materially
affected SLM's financial condition.

Id.

Almost exactly three years earlier, four of the six defendants in the Noteholders' Lawsuit had been sued by a class of former SLM shareholders who alleged violations of the federal securities laws ("Shareholders' Lawsuit"). Id. In the Shareholders' Lawsuit, the plaintiffs alleged that the defendants had issued reports, press releases and other public statements that contained materially false and misleading information about SLM's financial condition. These allegedly false statements concerned, among other things, SLM's net income for the first three-quarters of 1993, the percentage of its sales spent on television advertising and the effect the trademark infringement action had had on SLM's financial condition. Id.

Beginning its analysis, the Zunenshine Court noted that where a "pending litigation" exclusion was at issue and there had been no judicial determination of liability in the underlying lawsuits, the insurer may rely on the facts as alleged in the complaints to demonstrate that the exclusion applied. Id. at *4. The "pending litigation" exclusion contained in the ERI policy by its terms excluded coverage for claims "'arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event, or Wrongful Act' alleged in a pending lawsuit." Zunenshine, 1998 WL 483475 at *4.

The Zunenshine Court then observed that courts interpreting "pending litigation" exclusions focused on whether there was a sufficient "factual nexus" between the two lawsuits. Id. at *4 - *5. The Court then concluded that a comparison of the Noteholders' and Shareholders' Lawsuits revealed that there was a strong factual nexus between the two. Accordingly, the Court ruled that because the same "fact[s], circumstance[s], situation[s], transaction[s], [and] event[s], underlay both the Noteholders' and Shareholders' Lawsuits, the plaintiffs' claims were excluded from coverage" by the "pending litigation" provision in the ERI policy. Id. at *5.

BOS_446493_5/WROSEBUSH

The Zunenshine Court added that its reading of the "pending litigation" exclusion was consistent with the purpose behind "claims-made" insurance. This purpose is "to limit [the insurer's] liability to a fixed period of time." Id. at *5 citing, United States v. A.C. Strip, 868 F.2d 181, 187 (6th Cir. 1989).

2.    **Gateway Group Advantage, Inc. v. McCarthy**

The facts of the case at hand also run parallel to those contained in Gateway Group Advantage, Inc. v. McCarthy, 300 F. Supp.2d 236 (D. Mass. 2003). The Gateway case involved a "Prior Acts Exclusion" which operates to exclude coverage much like a "pending and prior claim" exclusion. In Gateway, the Court held that claims asserted in an action during the policy period which arose from the same or related wrongful acts alleged in an earlier action that predated the policy's commencement were effectively precluded from coverage by the "prior acts" exclusion.

In Gateway, the defendant insureds (collectively "IHA") brought a third-party action against their insurer, American International Specialty Lines Insurance Company ("AISLIC"). This suit sought defense costs and indemnification for claims asserted against IHA by the plaintiff, Gateway Group Advantage, LLC ("Gateway") under IHA's Directors, Officers and Private Company Liability Insurance Policy issued by AISLIC (the "IHA Policy"). Id. at 237.

Gateway had sued IHA claiming that IHA was liable for misrepresentation and related wrongs arising out of the sale of insurance franchises by IHA to Gateway. Id. This was not the first such suit brought against IHA. Rather, IHA had been the subject of a number of other suits commenced by franchisees prior to Gateway ("Prior Lawsuits"). These Prior Lawsuits were commenced in August 1998, December 3, 1998 and December 8, 1998.

The IHA Policy was effective from December 18, 1999 through December 18, 2000. Under an endorsement entitled "Prior Acts Exclusion," AISLIC provided an additional one-year period of retroactive coverage for "wrongful acts" that occurred on or after December 18, 1998. Id. at 240. The endorsement further provided, however, that:

> . . . the Insurer shall not be liable to make any payment for Loss in connection with any Claim(s) alleging any Wrongful Act(s) which occurred prior to December 18, 1998. This policy only provides coverage for Loss arising from Claims which allege Wrongful Acts occurring on or after December 18, 1998 and prior to the end of the Policy Period and otherwise covered by this policy. Loss(es) **arising out of the same or Related Wrongful Act(s)** shall be deemed to arise from the first such same or Related Wrongful Act.

Id. at 239 (emphasis added).

The IHA Policy defined Related Wrongful Acts, as, "[w]rongful Acts which are the **same, related** or continuous, or **Wrongful Acts which arise from a common nucleus of facts**. Claims can allege Related Wrongful Acts regardless of whether such Claims involve the same or different claimants, Insureds or legal causes of action." Id. (emphasis added). AISLIC accordingly denied coverage under the IHA Policy on the grounds that the wrongs alleged by Gateway against IHA on February 22, 2002 were "related wrongful acts" to the Prior Lawsuits which pre-dated December 18, 1998, the retroactive insurance coverage date. Id. at 237.

The Court in Gateway noted that the Prior Lawsuits established that IHA had a common marketing program for the sale of franchises, and that the claims brought by Gateway against IHA arose out of a "**common nucleus of facts** as IHA's conduct vis-à-vis other franchises which predates the coverage period." Id. at 238 (emphasis added). The Court's comparison of the complaints in the Prior Lawsuits to the Gateway complaint resulted in a finding that the allegations were substantially similar. Id. at 239-40.

- 13 -

Although the claims asserted in the Prior Lawsuits differed from those set forth in Gateway's complaint, the Court noted that "[t]he fact that the same misrepresentations may give rise to claims by different claimants, and may give rise to different causes of action based on the laws of different states does not prevent the claims from being "related" under the clear terms of the [IHA Policy]." Id. at 243. The Court stated that by giving the IHA Policy its ordinary meaning, the IHA actions complained of by Gateway were the "same" and/or "related" and/or "[arose] from a common nucleus of facts" as the Prior Lawsuits. "[E]ven if the wrongful acts were not the "same" or "related," they arise from a common nucleus of facts." Id.

Furthermore, the Court stated that it is "[b]eyond question [that] under Massachusetts law the phrase 'arising out of' denotes a level of causation that lies between proximate and actual causation" with "arising out of" being much broader than 'caused by.'" Id. at 245. In granting AISLIC's motion for summary judgment, the Court held that since the Prior Lawsuits arose prior to the coverage period of the IHA Policy, there was no coverage for the Gateway claims, which were excluded under the "Prior Acts Exclusion." Id. at 245.

3.    **The Rulings in Zunenshine and Gateway Apply Here.**

In the case at hand, the ERISA Complaint bases the causes of action asserted therein on allegations regarding: ongoing misrepresentations in Raytheon's public statements; financial problems and accounting improprieties affecting RE&C; cost overruns, project delays and a shortage of engineers affecting Raytheon's fixed-price Department of Defense contracts; and the decline in Raytheon's stock price following adverse public disclosures in October 1999. (ERISA Complaint, ¶¶ 65, 66, 68, 69, 72, 105-114, 116-120, 123). Just as the Zunenshine plaintiffs had been sued for misrepresentation before the Noteholders' Lawsuit and IHA had been had been sued for misrepresentation in several cases prior to Gateway, the ERISA Complaint is not the

first in which these allegations have been asserted against the Raytheon defendants. Rather, these same allegations were made against the Raytheon defendants in the Prior Litigation.

Thus the ERISA Litigation is: (1) based upon, arising from, or attributable to the Prior Litigation; and (2) contains the same or substantially similar facts, circumstances or situations underlying or alleged in the Prior Litigation, within the meaning of the Federal Pending and Prior Claims Exclusion. As a result, the Federal Pending and Prior Claims Exclusion excludes the ERISA Litigation from coverage under the Primary Policy.

Like the coverage exclusions in Zunenshine and in Gateway, the Pending or Prior Claims Exclusion contained in the Excess Policy provides, as follows:

> the Insurer shall not be liable for any amount in any Claim taking place during the Policy Period and arising under any Insurance Product, which is **based upon, arising from, or attributable to**:
>
> (a) any demand, suit or other proceeding pending . . . against any Insured on or prior to September 15, 2000 or any wrongful act, fact, circumstance or situation underlying or alleged therein; or
>
> (b) any other wrongful act, fact, circumstance or situation whenever occurring, which together with a wrongful act, fact, circumstance or situation described in (a) above **are causally or logically interrelated by a common nexus**.

[Complaint, Ex. B]

Therefore, coverage is also excluded under the Axis Pending and Prior Claims Exclusion for two reasons. First, the ERISA Litigation is based upon, arising from or is attributable to the Prior Litigation, or any wrongful act, fact, circumstance or situation underlying or alleged therein within the meaning of paragraph (a) of the Axis Pending and Prior Claims Exclusion. Additionally, the ERISA Litigation is based upon, arising from or is attributable to any other wrongful act, fact, circumstance or situation which is causally or logically interrelated by a

common nexus to a wrongful act, fact, circumstance or situation underlying or alleged in the Prior Litigation within the meaning of paragraph (b) of the Axis Pending or Prior Claims Exclusion. Therefore, coverage for the ERISA Litigation is excluded pursuant to both paragraph (a) and paragraph (b) of the Axis Pending and Prior Claims Exclusion.

In Zunenshine, the Court's comparison of the Complaints in the Noteholders' Lawsuit and the Shareholders' Lawsuit revealed that "there . . . [was] a strong factual nexus between the two." Zunenshine 1998 WL 483475 at *5. Likewise, in Gateway, the Court's comparison of the complaints in the Prior Lawsuits to the Gateway complaint resulted in a finding that the allegations were substantially similar and arose from a common nucleus of facts. Gateway, 300 F. Supp.2d at 239-40.

A comparison of the Prior Litigation complaint to the ERISA Litigation complaint unquestionably demonstrates that the ERISA Litigation is "logically interrelated by a common nexus" to the Prior Litigation within the meaning of both the Federal and Axis Pending and Prior Claims Exclusions. [Complaint, Ex. B]  In fact, the allegations in the ERISA Litigation complaint mirror the allegations in the Prior Litigation complaint in a number of significant ways, as set forth in the chart below:

- 16 -

| Meisel v. Raytheon (Prior Litigation) | Wall v. Raytheon (ERISA Litigation) |
|---|---|
| Class Period – 10/7/98-10/12/99 | Class Period – 10/7/98- present |
| Raytheon did not properly record losses on contracts | Same (did not record loses or reduced or deferred losses) |
| Raytheon had to sell RE&C Division and incurred losses | Same |
| Raytheon recognized premature revenues on anticipated contracts, then did not take write-downs when contracts were not executed | Same "Accounting irregularities" |
| Raytheon accelerated revenues to match costs prematurely booked | Same "project budgets adjusted to reflect increased costs" |
| Executives hid Executive Summary Reports (ESRs) on financial conditions of projects | Same |
| Raytheon had a critical shortage of engineers | Same |
| Raytheon filed false and misleading SEC statements | Same |
| 9/99 Press release issued by Raytheon regarding charges totaling $350-450 million; stock price dropped as a result amounting to the largest one day decline in Raytheon history | Same |
| 10/99 Wall Street Journal article revealed the truth about Raytheon's financial health | Same |
| NYSE halted trading of Raytheon stock | Same |
| 10/99 Raytheon Press release – over $600 in million charges actually taken (Not the $350-450 million announced in 9/99) | Same |
| Reduced earnings expectations 1999/2000 | Same |
| Stock price dropped and have not recovered as a result | Same |

Because of the "strong factual nexus" between the Prior Litigation and the ERISA Litigation, the ERISA Litigation is excluded from coverage under both the Federal and Axis policies. The Court therefore should enter Judgment in Axis's favor, declaring that coverage is not available as a result of the Pending and Prior Claims Exclusions in both the Federal and Axis policies.

## CONCLUSION

For the aforementioned reasons, the Federal and Axis Pending and Prior Claims Exclusions exclude the ERISA Litigation from coverage under the Primary (Federal) and Excess (Axis) Policy. Therefore, Axis is entitled to judgment pursuant to 28 U.S.C. § 2201(a) declaring that it has no liability under the Excess Policy with respect to the ERISA Litigation.

By its Attorneys,

John D. Hughes, Esq. (BBO No. 243660)
Windy L. Rosebush, Esq. (BBO No. 36962)
Edwards & Angell, LLP
101 Federal Street
Boston, MA 02110
Ph: (617) 439-4444
Fx: (617) 439-4170

Date:   June 1, 2004

## CERTIFICATE OF SERVICE

I, John D. Hughes, hereby certify that on this 1st day of June, 2004, I caused a copy of the foregoing Plaintiff's Memorandum in Support of Its Motion for Judgment on The Pleadings to be served by mailing a copy, via first class U.S. Mail, to:

James F. Kavanaugh, Jr., Esq.
Stephen S. Churchill, Esq.
Conn Kavanaugh Rosenthal Peisch & Ford, LLP
10 Post Office Square
Boston, MA 02109

James Gillispie, Esq.
Ryan Phair, Esq.
Thomas Yannucci, Esq.
Kirkland & Ellis
655 Fifteenth Street, N.W., Suite 1200
Washington, D.C. 20005

BOS_446493_5/WROSEBUSH

David J. Hensler
David Newmann
Ellen Kennedy
Hogan & Hartson
555 Thirteenth Street, N.W.
Washington, DC 20004-1109


Richard P. Campbell
Kurt B. Gerstner
Campbell, Campbell, Edwards & Conroy, PC
One Constitution Plaza
Boston, MA 02129

John D. Hughes

BOS_446493_5/WROSEBUSH